**Walter LOJUK, Plaintiff-Appellant,**

v.

**Marjorie QUANDT, Director of the Veterans Administration Hospital, et al., Defendants-Appellees.**

No. 82–1084.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 3, 1982.

Decided April 22, 1983.

As Modified July 19, 1983.

Patrick T. Murphy, Chicago, Ill., for plaintiff-appellant.

Daniel C. Murray, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for defendants-appellees.

* The Honorable William H. Timbers, Senior Circuit Judge of the United States Court of Appeals for the Second Circuit, is sitting by designation.

Before CUMMINGS, Chief Judge, CUDAHY, Circuit Judge, and TIMBERS, Senior Circuit Judge.*

CUMMINGS, Chief Judge.

Plaintiff Walter Lojuk alleges that he was subjected to electro-shock therapy (electro-convulsive therapy or ECT) without his consent and in spite of his family's objections while a voluntary patient at the Veterans Administration Medical Center in North Chicago, Illinois. Plaintiff alleges that he served in the United States Army on two occasions between 1968–1970 and 1971–1975. After his second discharge he suffered from depression and was placed in mental hospitals on three occasions. In March 1979 his family had him admitted to the Veterans Administration (VA) Hospital, the North Chicago Medical Center. At the time of his admission, records reflect that he was schizophrenic, mute, maintained no eye contact, was severely depressed and out of touch with reality. Medical reports reflect that plaintiff was "catatonic alternatively with dangerous violence—needs ECT" (First Amended Complaint ¶ 15).

Plaintiff alleges that the treating psychiatrist, defendant Dr. Bruce Johnson, or his agent, telephoned plaintiff's family to seek permission to proceed with ECT; such permission was denied. Plaintiff further alleges that a six-page memorandum issued in March 1978 and signed by defendant Marjorie Quandt, Director of the North Chicago Medical Center, required consent of next-of-kin before ECT could be administered. Plaintiff alleges that a consent form with his signature on it appears in his file, but he denies having signed it, and alleges that according to Dr. Johnson, he was incapable of giving consent (First Amended Complaint ¶ 17). In addition, plaintiff alleges that there exists an electro-shock research and experimentation program on human subjects at the VA hospital.

Plaintiff alleges common-law causes of action for gross negligence, malpractice and assault, as well as constitutional violations

of his Fifth and Eighth Amendment rights. He seeks actual and punitive damages against defendants Johnson and Quandt.[1] After satisfying the jurisdictional prerequisites to suit under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671 *et seq.,* plaintiff filed a first amended complaint adding the United States as defendant.

There are three district court orders on appeal in this case. On December 19, 1980, the district court granted the individual defendants' motion to dismiss, but gave plaintiff thirty days to amend the complaint to state a claim. Plaintiff's second amended complaint merely added two paragraphs alleging that defendants Quandt and Johnson knew or reasonably should have known their actions violated plaintiff's constitutional rights (App. III). On January 22, 1981, the district court denied leave to file the second amended complaint because it did not cure the defects of the first amended complaint. In its Memorandum Opinion, the court held that plaintiff's malpractice claims could not be brought against VA medical personnel such as defendants Quandt and Johnson because 38 U.S.C. § 4116(a) immunizes them from suit. Plaintiff's sole remedy for his malpractice claim was against the United States in accordance with the FTCA. In addition, the court held that plaintiff's allegation that ECT was administered without his consent did not state a claim of constitutional dimension, under either the Fifth or Eighth Amendment. After reaffirming its earlier conditional dismissal of the individual defendants, the court allowed the first amended complaint to stand against the United States.

Plaintiff then filed another second amended complaint against the United States under the FTCA for negligence, assault and malpractice. On December 28, 1981, the district court dismissed that complaint, holding that plaintiff's claim that he received ECT without consent constituted a

battery under Illinois law, which is specifically excluded from the waiver of sovereign immunity under the FTCA, 28 U.S.C. § 2680(h).

We reverse the district court's December 19, 1980, and January 22, 1981, orders dismissing the complaint against defendant Johnson but affirm the dismissal of defendant Quandt; we also affirm the December 28, 1981, order dismissing the complaint against the United States.

## I. The immunity problem

Selected VA personnel are immune from suit for malpractice or negligence under 38 U.S.C. § 4116(a) which provides:

§ 4116. Defense of certain malpractice and negligence suits

(a) The remedy—

(1) against the United States provided by sections 1346(b) and 2672 of title 28, or

(2) through proceedings for compensation or other benefits from the United States as provided by any other law, where the availability of such benefits precludes a remedy under section 1346(b) or 2672 of title 28,

for damages for personal injury, including death, allegedly arising from *malpractice* or negligence of a physician, dentist, podiatrist, optometrist, nurse, physician assistant, expanded-function dental auxiliaries, pharmacist, or paramedical (for example, medical and dental technicians, nursing assistants, and therapists) or other supporting personnel in furnishing medical care or treatment while in the exercise of such person's duties in or for the Department of Medicine and Surgery shall hereafter be exclusive of any other civil action or proceeding by reason of the same subject matter against such physician, dentist, podiatrist, optometrist, nurse, physician assistant, expanded-function dental auxiliaries, pharmacist, or

---

1. The district court dismissed plaintiff's claims for declaratory and injunctive relief on behalf of a class against D.L. McGee, the present Director of the North Chicago Medical Center, and Donald M. Ramsey, the Director of the VA Regional Office in Chicago. Plaintiff does not appeal this aspect of the dismissal (Br. 7 *).

paramedical or other supporting personnel (or such person's estate) whose act or omission gave rise to such claim. (Emphasis added).

The statute further provides that the Attorney General shall defend any civil suit brought against any person referred to in the foregoing subsection (a), 38 U.S.C. § 4116(b). After certifying that the defendant was acting in the scope of employment at the time of the incident out of which the suit arose, the Attorney General is required to remove the suit to federal court and it shall be deemed a tort action against the United States, *id.* § 4116(c).

Section 4116(a) directs a plaintiff to the FTCA, under which a claim may be brought against the United States for malpractice or negligence in accordance with state law, 28 U.S.C. § 2672. The FTCA, however, is but a limited waiver of the United States' sovereign immunity; exceptions to the waiver appear in 28 U.S.C. § 2680, and include "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights," *id.* § 2680(h). In its first Memorandum Opinion the district court characterized Lojuk's complaint as alleging medical malpractice falling within the ambit of Section 4116(a). The court therefore dismissed the individual defendants and instructed plaintiff that his sole remedy would be against the United States. But when plaintiff filed suit against the United States, the district judge in his second Memorandum Opinion characterized plaintiff's complaint as alleging a battery under Illinois law, thus falling within the ambit of Section 2680(h) and mandating dismissal against the United States.

Although the district court did not discuss it, the facial inconsistency of its characterizations can only be reconciled if we accept defendants' contention that the word "malpractice" in Section 4116(a) includes intentional torts such as battery. According to the defendants, Congress intended to deprive plaintiff of a judicial remedy for battery both from individual VA medical personnel and from the United States. In our view Congress intended to reconcile Section 4116(a) and Section 2680(h) in a more reasonable manner. After carefully considering the language and legislative history of Section 4116 and similar statutes granting official immunity, we conclude that Congress did not intend to immunize VA personnel under Section 4116(a) from suits for battery.

A. Plaintiff states a claim for battery

■ Illinois law distinguishes between medical malpractice cases alleging no informed consent and those claiming a total lack of consent to the medical procedure in question. *Mink v. University of Chicago,* 460 F.Supp. 713, 716–717 (N.D.Ill.1978). Informed consent cases concern the duty of a physician who has obtained consent to perform a medical procedure to disclose fully the risks associated with that procedure. Such cases are viewed as negligence actions. Total lack of consent cases involve a physician who undertakes to treat a patient without the patient's consent; absent consent, it is meaningless to require the disclosure of risks necessary to an "informed" decision. Rather, total lack of consent cases are treated as batteries because they involve an intentional unauthorized touching of the person of another. *Id.*

■ In his complaint, plaintiff alleges that he was subjected to ECT without his consent or the consent of his next-of-kin. Despite the presence of a signed consent form in his file, on a motion to dismiss we must take as true his allegation that because of his mental state he was unable to consent, and that either his "signature was forged * * * or he was made to sign something which [sic], according to Defendant Johnson and other V.A. officials he could not have known what he was signing" (First Amended Complaint ¶ 24). Because plaintiff in effect alleges a total lack of consent, we agree with defendants that the complaint alleges a battery, rather than a tort involving negligence. *Mink, supra.*

B. The United States is immune from suits for battery

■ The FTCA waives the United States' sovereign immunity from liability in tort

for suits brought against it in federal court. However, the United States as sovereign remains immune except as it consents to be sued, and the terms of its consent as specified by Congress define the court's jurisdiction to entertain a suit. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607, quoting *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058. As discussed above, Section 2680(h) excludes the tort of battery from the waiver of immunity. The courts that have considered the immunity of the United States from liability for surgical or medical acts have reached differing conclusions as to the applicability of Section 2680(h). In *Moos v. United States,* 225 F.2d 705 (8th Cir.1955), a VA surgeon operated on plaintiff's right leg and hip although plaintiff had consented to surgery on his left leg and hip. The court held that the surgery constituted a battery for which the United States was immune. Accord *Hernandez v. United States,* 465 F.Supp. 1071, 1074 (D.Kan.1979). On the other hand, in *Lane v. United States,* 225 F.Supp. 850 (E.D.Va.1964), the court considered a similar surgical error and held that it was only a "technical" battery, essentially resulting from the surgeon's carelessness. In the absence of an intentional wrongful act, the court held that Section 2680(h) did not apply. *Id.* at 853. We need not resolve this debate because this case involves more than a "technical" battery. Plaintiff alleges that according to defendant Johnson, he was unable to consent to ECT and that defendant nonetheless had ECT administered to him. The complaint in essence alleges the intentional wrongful act required to state a claim for battery and does not rely on negligence or carelessness as in *Lane, supra.*

The case of *Wright v. Doe,* 347 F.Supp. 833 (M.D.Fla.1972), on which plaintiff relies, presents a more substantial problem. In *Wright,* plaintiff sued a VA doctor in state court alleging that the doctor had misrepresented the characteristics and qualities of medication prescribed for her. After removal to federal court and substitution of the United States as defendant pursuant to 38 U.S.C. § 4116(c), the plaintiff sought a remand to state court to proceed against the VA physician individually. The district court found that Section 4116(a) was designed to accomplish two purposes. First, it was intended to extend the broadest possible protection to VA medical personnel; to that end, the term "malpractice" should be read in its broadest sense to encompass any tortious conduct including fraud, assault and battery, and misrepresentation. The district court therefore denied the motion to remand and held the physician immune from suit. In addition, the court apparently believed that Section 4116(a) in effect amended Section 2680(h); in order to fully protect VA personnel, the United States would be liable despite Section 2680(h) in circumstances for which Section 4116(a) immunized the VA defendants. The district court thus permitted plaintiff to sue the United States in federal court.

Given that waivers of sovereign immunity must be strictly construed, *United States v. Mitchell,* 445 U.S. at 538, 100 S.Ct. at 1351, we are reluctant to infer that Congress intended to erode the immunity of the sovereign simply by virtue of its enactment of an additional immunity statute to protect officials. An examination of other official immunity statutes indicates that Congress knew suits against the United States for assault and battery in medical treatment cases would be barred under the FTCA. When Congress intended to substitute the United States for government personnel despite Section 2680(h), it included an additional section in the statute immunizing government personnel (as in a statute for Public Health Service employees) which provides:

> For purposes of this section, the provisions of section 2680(h) of Title 28 shall not apply to assault or battery arising out of negligence in the performance of medical, surgical, dental, or related functions, including the conduct of clinical studies or investigations.

42 U.S.C. § 233(e). See also 42 U.S.C. § 2458a(e) (NASA); 10 U.S.C. § 1089(e) (Armed Forces). Section 4116 in contrast contains no such reference to Section 2680(h).

■ We therefore agree with defendants that the United States is immune from suit under Section 2680(h) from claims for battery. See *Johnson v. United States,* 547 F.2d 688 (D.C.Cir.1976) (United States immune from charges of false arrest and false imprisonment). The district court's third order dismissing the complaint against the United States is affirmed.

## C. VA medical personnel are not immune from suit for battery

Section 4116(a) expressly immunizes certain VA medical personnel from suits arising out of "malpractice or negligence." Although defendants acknowledge that battery is an intentional tort they urge us to construe "malpractice" broadly, as did the court in *Wright v. Doe, supra.* An examination of the language and legislative history of Section 4116 and similar statutes, however, indicates that a broad construction is unwarranted.

Section 4116(a) was enacted in 1965 and modeled after the Federal Drivers Liability Act, 28 U.S.C. § 2679(b). The basic purpose of both statutes, of course, was to provide protection for government personnel in the event of a suit brought against them for acts done in the scope of employment. Early on, the courts began to confront the question of whether, under the Federal Drivers Liability Act, a federal employee who was injured by the negligent conduct of a fellow employee in operating a government vehicle could recover against either the United States under the FTCA or the individual driver. Because the Federal Employees Compensation Act provided the exclusive remedy for a federal employee against the United States, 5 U.S.C. § 8116(c), a remedy under the FTCA was precluded. But if a remedy against the United States was unavailable, plaintiffs argued, then the immunity granted to the individual negligent driver by the Federal Drivers Liability Act did not apply, and plaintiffs could sue the driver in state court. The courts in general disagreed, holding that a plaintiff's status as a federal employee should not alter the immunity of the

defendant driver. See, *e.g., Carr v. United States,* 422 F.2d 1007 (4th Cir.1970); *Van Houten v. Ralls,* 411 F.2d 940 (9th Cir.1969), certiorari denied, 396 U.S. 962, 90 S.Ct. 436, 24 L.Ed.2d 426; *Vantrease v. United States,* 400 F.2d 853 (6th Cir.1968).

Despite these cases interpreting the Federal Drivers Liability Act, in 1973 Congress amended Section 4116(a) to include paragraph (2), thus insuring that VA personnel would not be liable to fellow employees for malpractice or negligence. See *supra* Part I. Oddly enough, Congress did not amend the Federal Drivers Liability Act, evidently "content to rely on * * * judicial construction." *Thomason v. Sanchez,* 539 F.2d 955, 958 n. 6 (3d Cir.1976), certiorari denied, 429 U.S. 1072, 97 S.Ct. 809, 50 L.Ed.2d 790. The 1973 VA amendments also added Section 4116(e) to clarify the scope of protection for VA personnel and to "extend this protection to cases where Federal Tort claims actions would not lie, but actions could still be brought against the VA employee personally for actions arising in the exercise of his duties." H.Rep. No. 93–368, 93d Cong., 1st Sess., reprinted in 1973 U.S.Code Cong. & Ad.News 1688, 1710. Section 4116(e) provides:

> The Administrator may, to the extent the Administrator deems appropriate, hold harmless or provide liability insurance for any person to whom the immunity provisions of this section apply (as described in subsection (a) of this section), for damage for personal injury or death, or for property damage, negligently caused by such person while furnishing medical care or treatment (including the conduct of clinical studies or investigations) in the exercise of such person's duties in or for the Department of Medicine and Surgery, if such person is assigned to a foreign country, detailed to State or political subdivision thereof, or is acting under any other circumstances which would preclude the remedies of an injured third person against the United States, provided by sections 1346(b) and 2672 of title 28, for such damage or injury.

A letter and analysis from Donald E. Johnson, Administrator of the Veterans Admin-

istration in 1972, indicate that the VA interpreted Section 4116(e) to provide protection similar to that contained in 42 U.S.C. § 233 applicable to Public Health Service personnel. Subsection (e) would "provide a means of protecting Department of Medicine and Surgery medical personnel who are assigned to a foreign country, or who are sued for assault and battery, false imprisonment, or libel and slander in connection with the performance of their assigned duties." Sen.Rep. No. 92–776, 92d Cong., 2d Sess. 51 (1972).

An examination of the language and legislative history of several similar statutes immunizing a variety of government employees indicates that Congress did not intend to immunize officials from battery claims under subsection (a) unless a plaintiff had an alternative remedy against the United States under the FTCA. See, e.g., 42 U.S.C. § 233 (Public Health Service); 42 U.S.C. § 2458a (NASA); 10 U.S.C. § 1089 (Armed Forces). In all of these statutes, the text of subsection (a) is substantially similar to Section 4116(a). Yet to immunize officials from battery claims, Congress added another subsection, subsection (e), which in each case expressly waives the battery provision of Section 2680(h). See supra Part I–B. The legislative history of 10 U.S.C. § 1089, for example, which immunizes medical personnel in the Armed Forces from suits arising out of medical malpractice, explains that the purpose of subsection 1089(e) is to

> nullify a provision of the Federal Tort Claims Act which would otherwise exclude any action for assault and battery from the coverage of the Federal Tort Claims Act. In some jurisdictions it might be possible for a claimant to characterize negligence or a wrongful act as a tort of assault and battery. *In this way,*

*the claimant could sue the medical personnel in his individual capacity notwithstanding subsection (a) simply as a result of how he pleaded his case.* In short, subsection (e) makes the Federal Tort Claims Act the exclusive remedy for any action, including assault and battery, that could be characterized as malpractice.

Sen.Rep. No. 94–1264, 94th Cong., 2d Sess. 9–10, reprinted in 1976 U.S.Code Cong. & Ad.News 4443, 4451. (Emphasis added). Thus, in 10 U.S.C. § 1089, 42 U.S.C. § 233, and 42 U.S.C. § 2458a, it is the presence of subsection (e) waiving the immunity of the United States for battery under Section 2680(h) that provides immunity for individual defendants in medical treatment cases. Without a comparable subsection in Section 4116, there is no official immunity from battery, because there is no alternative remedy available against the United States.[2] Cf. *Henderson v. Bluemink,* 511 F.2d 399, 404 (D.C.Cir.1974) generally, the Federal Tort Claims Act "proscribes a double recovery, not a suit against the individual employee in the first instance"). Congress did not intend to provide official immunity from suit for battery under Section 4116(a) standing alone.

Judge Bartel's opinion in *Smith v. DiCara,* 329 F.Supp. 439 (E.D.N.Y.1971), lends support to this interpretation. In *Smith,* plaintiff sued a VA physician for defamation of character after he issued a report identifying plaintiff as an alcoholic. Although plaintiff was a federal employee, the case was brought before the 1973 amendments and the enactment of Section 4116(a)(2). According to the *Smith* court's analysis, however, the amendment would not have changed the result. The court did not disagree with the Federal Drivers Liability Act cases holding that a plaintiff's

---

**2.** We base our interpretation of Section 4116 on an analysis of Congressional intent to provide alternative judicial remedies against either individual VA personnel or the United States under the FTCA. Thus the availability of an administrative remedy under the Veterans Disability Compensation Act, 38 U.S.C. § 351, is irrelevant to our interpretation of Section 4116(a)(1). Section 4116(a)(2) does provide

that availability of an administrative remedy will immunize VA officials if that remedy "precludes a remedy under [the FTCA]." In the circumstances of this case, disability compensation provided under 38 U.S.C. § 351 does not preclude suit under the FTCA. *United States v. Brown,* 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139. Cf. *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152.

status as a federal employee should not affect a defendant's immunity under the statute. 329 F.Supp. at 442–443 & n. 5. Rather, the court held that regardless of plaintiff's status, Section 4116(a) was not intended to immunize VA personnel from intentional torts like defamation. The statute heading covered only the defense of certain "malpractice and negligence suits." *Id.* at 442. In addition, the legislative history, "notwithstanding the rather broad references in subsection (a) of § 4116 to suits for 'personal injury'" supports the limitations suggested by the statute's heading. For example, the court relied on one report, *id.,* which reads in part: " 'Subsection 4116(a) of title 38 concerns tort claims based on alleged *negligence* of Veterans Administration medical personnel.' (Emphasis added)." Sen.Rep. No. 1327, 89th Cong., 2d Sess., reprinted in 1966 U.S.Code Cong. & Ad.News 2515, 2523. The court concluded that plaintiff could maintain an action for defamation against the individual defendant in state court.

■ We agree with the *Smith* interpretation. Even if the meaning of "malpractice or negligence" was unclear before the 1973 amendments, there can be no doubt of Congress's intention after the 1973 amendments. By adding Section 4116(e) to provide liability insurance for VA personnel acting under "circumstances which would preclude the remedies of an injured third person against the United States" under the FTCA, and by omitting an express waiver of the assault and battery exception of Section 2680(h), Congress structured the statute to allow suit for battery to be brought against individual VA personnel. We therefore hold that the district court erred in dismissing plaintiff's claim against defendant Johnson on statutory immunity grounds. The claim against Quandt is discussed *infra.*

## II. Constitutional causes of action

Thus far, we have held that plaintiff may state a claim under state law against an individual defendant despite Section 4116(a). In order to retain federal jurisdiction, however, we must decide whether plaintiff states a constitutional claim as well. We address the Eighth and Fifth Amendment claims in turn.

### A. The Eighth Amendment

The Eighth Amendment limits the power of the state to prescribe "punishment." See *Ingraham v. Wright,* 430 U.S. 651, 670–671 n. 39, 97 S.Ct. 1401, 1412 n. 39, 51 L.Ed.2d 711. Although it was originally intended to limit criminal punishments, the Supreme Court has noted that "[s]ome punishments, though not labeled 'criminal' by the State, may be sufficiently analogous to criminal punishments in the circumstances in which they are administered to justify application of the Eighth Amendment." *Id.* at 669 n. 37, 97 S.Ct. at 1411 n. 37 (citation omitted). In *Knecht v. Gillman,* 488 F.2d 1136 (8th Cir.1973), for example, the court considered the involuntary use of the drug apomorphine as "aversive stimuli" on inmates at the Iowa Security Medical Facility for "such pieces of behavior as not getting up, for giving cigarettes against orders, for talking, for swearing, or for lying." *Id.* at 1137. The effect of the drug was to induce vomiting for between fifteen minutes and one hour. Noting that the "mere characterization of an act as 'treatment' does not insulate it from eighth amendment scrutiny," *id.* at 1139, the court held that forced administration of the drug without knowing and intelligent consent is cruel and unusual punishment in violation of the Eighth Amendment. See also *Mackey v. Procunier,* 477 F.2d 877 (9th Cir.1973); *Wheeler v. Glass,* 473 F.2d 983 (7th Cir.1973).

This case does not present a situation appropriate for Eighth Amendment analysis. First, plaintiff makes no allegation that ECT was administered as punishment, but rather complains that a treatment decision was made without his consent. See *Price v. Sheppard,* 307 Minn. 250, 239 N.W.2d 905, 908–909 (Minn.1976). In addition, we are reluctant to extend the Eighth Amendment to cases involving plaintiffs who "voluntarily" [3] place themselves in the

---

**3.** Although the complaint indicates that plaintiff's family had him admitted to the VA hospi-

tal, there is no indication that plaintiff was

custody of the government. *Cf. Ingraham v. Wright,* 430 U.S. 651, 670–671, 97 S.Ct. 1401, 1412, 51 L.Ed.2d 711. As in *Ingraham, id.,* the Due Process Clause provides a better framework for analysis of plaintiff's constitutional claims.

B. The Fifth Amendment

The question presented by this case is whether a patient who is "voluntarily" admitted to a psychiatric facility and is incompetent to make treatment decisions has a constitutional liberty interest in avoiding the unwanted administration of ECT that must be protected under the Due Process Clause. Although the Supreme Court has rejected the notion that "*any* grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause," *Meachum v. Fano,* 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451, it has also held that the inquiry should focus on the "*nature* of the interest at stake." *Board of Regents v. Roth,* 408 U.S. 564, 571, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548. Other courts that have confronted the issue of compulsory treatment have identified three interests that are implicated. First, several courts have found that compulsory treatment with mind-altering drugs may invade a patient's First Amendment interests in being able to think and communicate freely. *Scott v. Plante,* 532 F.2d 939, 946 (3d Cir.1976), on appeal after remand, 641 F.2d 117 (3d Cir. 1981), vacated in light of *Youngberg v. Romeo,* —— U.S. ——, 102 S.Ct. 3474, 73 L.Ed.2d 1362, *Davis v. Hubbard,* 506 F.Supp. 915, 933 (N.D.Ohio 1980). *Cf. Price v. Sheppard,* 307 Minn. 250, 239 N.W.2d 905, 911 (Minn.1976) (ECT may result in "alteration of the patient's personality"); *Winters v. Miller,* 446 F.2d 65 (2d Cir.1971) (freedom of religion implicated), certiorari denied, 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369. Second, compulsory treatment with antipsychotic drugs may invade a patient's interest in bodily integrity, personal security and personal dignity. *Rennie v. Klein,* 653 F.2d 836, 844 (3d Cir.1981) (*en banc*), vacated in light of *Youngberg v. Romeo,* ——

U.S. ——, 102 S.Ct. 3506, 73 L.Ed.2d 1381; *Davis v. Hubbard,* 506 F.Supp. at 931. See also *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28; *Johnson v. Brelje,* 701 F.2d 1201, 1208, 1209 (7th Cir. 1983). Finally, compulsory treatment may invade a patient's interest in making certain kinds of personal decisions with potentially significant consequences. *Davis v. Hubbard,* 506 F.Supp. at 931–933; *Price v. Sheppard,* 307 Minn. 250, 239 N.W.2d at 910 (personal autonomy); *In re K.K.B.,* 609 P.2d 747, 750–751 (Okl.1980) (privacy).

All of these interests are implicated by compulsory ECT. *Cf. Ingraham v. Wright,* 430 U.S. 651, 673, 97 S.Ct. 1413, 51 L.Ed.2d 711 (historically individual has a liberty interest in remaining free from unjustified intrusions on personal security); *Vitek v. Jones,* 445 U.S. 480, 492, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552 (compelled treatment in form of mandatory behavior modification program is factor to be weighed in identifying liberty interest). ECT is a highly intrusive and controversial form of treatment. According to one court, ECT "is a technique by which a current of from 70 to 130 volts of electricity is permitted to flow through the patient's brain, causing a convulsion equivalent to an epileptic seizure." *New York City Health and Hosps. Corp. v. Stein,* 70 Misc.2d 944, 335 N.Y.S.2d 461, 463–464 (Sup.Ct.Spec.Term 1972). According to the first amended complaint (¶ 19),

> Electro shock treatment consists of placing the Plaintiff on a long flat table. Prior to the shock treatment, the Plaintiff would have been injected with a drug which would partially paralyze the muscles. During the treatment itself electrodes would be attached to various parts of the Plaintiff's head. The electro shocks would be introduced and the Plaintiff's body would have gone into violent convulsions.

ECT has several adverse effects, including memory loss and intellectual disorientation. *Aden v. Younger,* 57 Cal.App.3d 662, 129 Cal.Rptr. 535, 541 (Cal.Ct.App.1976). One commentator has said that "[a]lthough it·is

"involuntarily" committed in accordance with applicable statutory commitment proceedings.

certain that some disorientation, confusion, and memory impairment will result from ECT, the argument over ECT's safety centers upon the permanency and depth of these effects." Plotkin, *Limiting the Therapeutic Orgy: Mental Patients' Right to Refuse Treatment*, 72 N.W.U.L.Rev. 461, 472–473 (1977) (footnotes omitted). Since the procedure is still so little understood, other adverse effects such as permanent brain damage and a slowing of brain waves are possible. *Aden v. Younger*, 57 Cal. App.3d 662, 129 Cal.Rptr. at 541.

It should be obvious in light of this liberty interest that the state cannot simply seize a person and administer ECT to him without his consent. *Cf. Rennie v. Klein*, 653 F.2d at 843. With respect to anti-psychotic drugs, several courts have held that despite involuntary civil commitment proceedings, a patient " 'retain[s] a residuum of liberty that would be infringed' by compulsory medication 'without complying with minimum requirements of due process.' " *Rennie v. Klein*, 653 F.2d at 843, quoting *Vitek v. Jones*, 445 U.S. 480, 491, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552. See also *Scott v. Plante*, 532 F.2d at 946; *Winters v. Miller*, 446 F.2d at 68–71 (First Amendment rights implicated); *Davis v. Hubbard*, 506 F.Supp. at 929; *In re K.K.B.*, 609 P.2d at 751; *Price v. Sheppard*, 239 N.W.2d at 911 (ECT). *Cf. Mills v. Rogers*, 457 U.S. 291, 299, 102 S.Ct. 2442, 2448 & n. 16, 73 L.Ed.2d 16 (Supreme Court assumed involuntarily committed patients retain liberty interest in avoiding unwanted administration of antipsychotic drugs). Defendants attempt to distinguish these cases by emphasizing plaintiff's status as a "voluntary" patient at the VA hospital. They argue in effect that a patient who is able voluntarily to seek treatment in a psychiatric hospital must be capable of ending any unwanted treatment by simply leaving the hospital. A voluntary patient's "right to refuse treatment," it is said, thus does not rise to the level of a constitutionally protected liberty interest because a voluntary patient "carries the key to the hospital's exit in [his] hand." *Doe v. Public Health Trust*, 696 F.2d 901, 903 (11th Cir.1983). See also *Rogers v. Okin*, 634 F.2d

650, 661 (1st Cir.1980), vacated *sub nom. Mills v. Rogers*, 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982).

Given the allegations of incompetence in the complaint, this argument is not persuasive. It is highly unlikely that a patient who is schizophrenic, mute, severely depressed and out of touch with reality can simply walk out of a VA hospital on his own (First Amended Complaint ¶ 15). It is also unclear at this stage of the pleadings whether plaintiff's relatives either could have removed or were legally obligated as guardians to remove plaintiff from the VA hospital if they were dissatisfied with the treatment (Def.Br. 20). Thus it appears that plaintiff, though technically a "voluntary" patient, was a "de facto involuntary patient" because of his incompetence. *Doe v. Public Health Trust*, 696 F.2d at 905.

In most of the cases cited above, a patient's liberty interest in making treatment decisions was held to survive involuntary civil commitment proceedings on the assumption that involuntary commitment is not equivalent to a determination of incompetency to make treatment decisions. *Rennie v. Klein*, 653 F.2d at 846; *Scott v. Plante*, 532 F.2d at 946; *Winters v. Miller*, 446 F.2d at 68; *Davis v. Hubbard*, 506 F.Supp. at 935; *In re K.K.B.*, 609 P.2d at 749. This case in contrast involves an incompetent patient. However, a patient's incompetency should not deprive him of a liberty interest in "making" treatment decisions. Such a rule would have the absurd result of granting less protection to those incompetent patients who are in greater need of it. It is of course evident that a patient who is by definition incompetent will not really be able to "make" these decisions on his own. But this simply means that someone else acting in the patient's best interests will have to make the decision for him.

After identifying a liberty interest, the next step in a due process analysis would normally involve identifying the procedures that are constitutionally required before the state may deprive plaintiff of his liberty interest. See *Johnson v. Brelje, supra*, at

1206. Plaintiff urges this Court to hold that due process requires appointment of a guardian to consent to ECT on behalf of an incompetent patient. *Cf. In the Matter of Guardianship of Richard Roe, III,* 383 Mass. 415, 421 N.E.2d 40 (Mass.1981) (non-institutionalized but mentally incompetent person has right under the common law of Massachusetts and the United States Constitution to judicial determination of substituted judgment before anti-psychotic drugs can be administered). At the other extreme, defendants argue that if we accept the due process argument at all, we should hold that treatment decisions concerning a voluntary but incompetent patient require at most that a staff psychiatrist exercise independent professional judgment in prescribing the treatment. *Cf. Parham v. J.R.,* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (in admitting child as voluntary mental patient, independent medical decision by admitting physician is constitutionally sufficient process). Although convinced that involuntary ECT implicates a constitutionally protected liberty interest, at this stage of the proceedings we are unable to define precisely the scope of that interest or "the minimum procedures required by the Constitution for determining that the individual's liberty interest actually is outweighed in a particular instance." *Mills v. Rogers,* 102 S.Ct. at 2448. In *Mills, supra,* the Supreme Court considered the right of a mental patient involuntarily committed in Massachusetts to refuse treatment with anti-psychotic drugs. Noting that the "rights provided by the Federal Constitution define only a minimum," the Court held that the governing law, which in the *Mills* case was state law, may recognize a more extensive liberty interest. *Id.* at 2449. In addition, the constitutionally mandated procedures will depend on the "nature and weight of the *state* interests, as well as the individual interests, that are asserted." *Id.* at 2451 (emphasis in original). Thus the Court declined to identify either the substantive or procedural rights as defined by the Federal Constitution in light of the possibility that the governing law of the state provided broader protection.

In this case, the parties have not brought to our attention the relevant state or federal statutes that may further define the scope of the liberty interest, nor have they argued in any detail about the nature of ECT. Although plaintiff does identify a 1978 policy promulgated by defendant Quandt requiring consent of next-of-kin before administering ECT, the parties have not referred us to the governing statutes or regulations. *Cf.* Ill.Rev.Stat., ch. 91½, ¶ 2–110 (requiring recipients of Illinois mental health services to give informed consent before ECT); 38 C.F.R. § 17.34 (requiring informed consent before treatment for a service-connected disability in a VA facility). In addition, neither party has identified the relevant governmental interests involved, nor provided more than a perfunctory sketch of the procedures they believe the Constitution requires to satisfy due process.

On the basis of the record before us, the precise requirements of due process cannot be satisfactorily defined. However, the district court's dismissal must be reversed because on the basis of the complaint we can envision a set of facts that plaintiff could prove to entitle him to relief. As argued by defendants, the procedures require at a minimum that a staff psychiatrist exercise independent professional judgment in prescribing treatment and the record at this stage does not so show. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28, the Supreme Court adopted a similar standard. The Court held that involuntarily committed mentally retarded individuals are entitled to minimally adequate or reasonable training in light of their liberty interests in safety and freedom from undue restraint. *Id.* at 2461. In determining what is "reasonable," the Court held that the decision, "if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 2462 (footnotes omitted).

See also *Johnson v. Brelje, supra,* at 1209; *Doe v. Public Health Trust,* 696 F.2d at 904 n. 1. If plaintiff in this case can prove that defendant Johnson's decision to administer ECT departed from accepted professional practice, a claim would be stated under even the most lenient reading of the Due Process Clause. We hold that plaintiff's allegations are sufficient to include this claim.

 However, Marjorie Quandt must be dismissed as a defendant. Plaintiff cannot maintain a *Bivens*-type action against federal officials on the basis of the doctrine of respondeat superior. *Beard v. Mitchell,* 604 F.2d 485, 497–498 (7th Cir.1979). As in cases under 42 U.S.C. § 1983, to recover damages plaintiff must establish defendant's personal responsibility for the claimed deprivation. A generous reading of the complaint reveals that plaintiff seeks to hold defendant Quandt liable on two grounds: first, by alleging that she was directly responsible for issuing a policy that was constitutionally deficient (First Amended Complaint ¶ 25), and second, by alleging that she was indirectly responsible because of her inadequate supervision (App. III ¶ 20(c)).

 Although plaintiff alleges that the next-of-kin policy promulgated by defendant Quandt was unconstitutional, he also alleges that defendant Johnson acted in violation of that policy (First Amended Complaint ¶ 16). If defendant Johnson had executed the policy, defendant Quandt might have been liable as the "moving force of the constitutional violation." *Monell v. Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611. *Cf. Polk Cty. v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509. Here, however, the constitutional violation was not caused by the existence of the policy, but rather by defendant Johnson's alleged actions in defiance of the policy. See *Powe v. City of Chicago,* 664 F.2d 639, 649 (7th Cir.1981). Even if the policy were unconstitutional, it did not cause this particular plaintiff's injury.

 Plaintiff's attempt to hold defendant Quandt liable for inadequate supervision must also fail. Without direct participation in the deprivation, an official can satisfy the personal responsibility requirement if "she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent." *Crowder v. Lash,* 687 F.2d 996 (7th Cir.1982) (citations omitted). There are no allegations that Quandt knew this particular plaintiff, nor had any knowledge that he was subjected to ECT. In addition, there are no allegations of a plan or pattern of incidents which should have put defendant Quandt on notice that patients were being subjected to ECT without consent. Plaintiff's general allegation that Quandt's inadequate supervision "would lead to the violation of established constitutional rights of the patients," is clearly insufficient to satisfy the personal responsibility requirement for damage suits. *Cf. Crowder v. Lash, supra* at 1005–1006.

 This case involves a constitutional claim against federal officials in accordance with *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619. A cause of action to recover damages against an official may be defeated in two situations, *Carlson v. Green,* 446 U.S. 14, 18–19, 100 S.Ct. 1468, 1471–1472, 64 L.Ed.2d 15:

> The first is when defendants demonstrate "special factors counselling hesitation in the absence of affirmative action by Congress." [*Bivens, supra*], 403 U.S., at 396 [91 S.Ct. at 2004:] *Davis v. Passman,* 442 U.S. 228, 245 [99 S.Ct. 2264, 2277, 60 L.Ed.2d 846] (1979). The second is when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective. *Bivens, supra* [403 U.S.] at 397 [91 S.Ct. at 2005]; *Davis v. Passman, supra* [442 U.S.] at 245–247 [99 S.Ct. at 2277–2278].

Defendants have not suggested any special factors counselling hesitation in this case. Although they have identified an alternative remedy in the form of 38 U.S.C. § 351, see *supra* note 2, that administrative disability compensation statute does not constitute an "explicit congressional declaration" of an equally effective remedy. *Bivens, supra* 403 U.S. at 397, 91 S.Ct. at 2004. Thus there is no discernible reason under current Supreme Court precedent to decline to entertain the cause of action in this case. See *Micklus v. Carlson,* 632 F.2d 227, 239–240 (3d Cir.1980).

Finally, defendants argue that they are absolutely immune at least from state causes of action on the basis of *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434, and *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895. In *Barr v. Matteo, supra,* the Supreme Court held that high-level executive officials acting within the scope of their authority are absolutely immune from suits for defamation if they can show that they perform "discretionary acts at those levels of government where the concept of duty encompasses the sound exercise of discretionary authority." *Id.* 360 U.S. at 575, 79 S.Ct. at 1341. Officials who formulate policy may be entitled to greater immunity than officials who merely execute policy, because policy decisions consist of inherently discretionary determinations. See *Henderson v. Bluemink,* 511 F.2d 399, 401 (D.C.Cir.1974). *Cf. George v. Kay,* 632 F.2d 1103 (4th Cir.1980), certiorari denied, 450 U.S. 1029, 101 S.Ct. 1738, 68 L.Ed.2d 224; *Granger v. Marek,* 583 F.2d 781 (6th Cir.1978); *Evans v. Wright,* 582 F.2d 20 (5th Cir.1978). Medical decisions made by a treating physician may not be comparable to the policy decisions absolute immunity was meant to protect. See *Jackson v. Kelly,* 557 F.2d 735 (10th Cir.1977); *Henderson v. Bluemink,* 511 F.2d 399 (D.C. Cir.1974); *Burchfield v. Regents of the Univ. of Colorado,* 516 F.Supp. 1301 (D.Colo. 1981).

If there were a possibility of dismissing the entire suit against the only remaining defendant, Bruce Johnson, we would of course consider the absolute immunity claim. However, the presence of the constitutional claim precludes total dismissal on immunity grounds because official immunity from constitutional claims is governed by a different standard. Under *Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396. Dr. Johnson, if entitled to any immunity at all, would be entitled at most to a qualified immunity which must be asserted as an affirmative defense by the defendant official. *Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572. Because there was no answer filed by the individual defendants in this case, the district court on remand must decide the issue of qualified immunity if it is properly raised. In light of the limited briefing on the issue, it is best to leave the question of absolute immunity from state tort claims to the district court as well.

The district court's order dismissing the complaint against the United States is affirmed. The orders dismissing the complaint against the individual defendants are affirmed with respect to Marjorie Quandt and reversed with respect to Bruce Johnson, and the cause is remanded for further proceedings consistent with this opinion. Circuit Rule 18 shall apply.